IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs April 24, 2018

**STATE OF TENNESSEE v. GARY RAY WELDON**

**Appeal from the Criminal Court for Campbell County**
**No. 16812      E. Shayne Sexton, Judge**

**————————————————————**

**No. E2017-01474-CCA-R3-CD**

**————————————————————**

Defendant, Gary Ray Weldon,[1] was convicted by a Campbell County jury of one count of solicitation of a minor to engage in aggravated statutory rape, and he was sentenced to one year in confinement. He appeals, arguing that the evidence is insufficient to sustain his conviction. Upon our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

G. Matthew Roberts, Knoxville, Tennessee (on appeal); and Daniel H. Korth Maynardville, Tennessee (at trial) for the appellant, Gary Ray Weldon.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Jared R. Effler, District Attorney General; and Lindsey Cadle and Meredith Slemp, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

---

[1] The State filed a motion to amend the indictment to change the spelling of Defendant's last name to "Welden." While the record does not indicate whether the trial court ruled upon this motion, several filings in the record, including the judgment of conviction, refer to Defendant as "Welden." However, Defendant's notice of appeal, his appellate brief, the cover of the technical record, and the trial transcripts refer to him as "Weldon," and that is the spelling that we shall use in this opinion.

On March 13, 2015, the Campbell County Grand Jury indicted Defendant on one count of solicitation of a minor to engage in aggravated statutory rape. At trial, the victim, C.F.,[2] testified that she began dating Defendant's fifteen-year-old son in August 2014. At the time, she was fourteen years old and a freshman in high school. C.F. believed Defendant was in his forties. C.F. first met Defendant in person when he drove her and his son to a school choir trip to a bowling alley.

Prior to the bowling trip, Defendant contacted C.F. on Facebook and engaged her in "small talk" shortly after she began dating his son. Defendant asked C.F. for her phone number and told her not to tell his son. C.F. gave Defendant her phone number because she "didn't want him to dislike [her] because [she] was dating his son." Defendant began texting C.F. shortly after she gave him her phone number. The frequency of Defendant's texts varied, and some days he texted her "a lot." C.F. testified that the texts began as "just small talk . . . and then it kind of got inappropriate." The State entered into evidence several photographs of C.F.'s phone showing a series of text messages between her phone and a phone number that she identified as belonging to Defendant between December 31, 2014, and January 4, 2015.

At 2:01 a.m. on December 31, 2014, Defendant texted C.F., "I like u laughen and to feel u holden me would[ ]be even nicer i think." Defendant asked if C.F. would hold him back and said, "It wouldnt be as fun if u didnt." C.F. responded that she did not even let Defendant's son, her boyfriend, hold her. Defendant stated that C.F. "just aint tried it" yet and suggested that he could pick her up at "the park" to see if she "liked [it] or not." C.F. testified that when Defendant said "it," she believed that he was referring to "[b]eing held." Defendant again mentioned "how [C.F.] felt huggen." When C.F. responded that she did not know about hugs, Defendant asked if she was "scared or not attracted to [him]." C.F. told Defendant that she was not attracted to him and instead "liked" his son. Defendant responded that they "shouldn[']t" if she did not "want[] that with [him]." Defendant stated that he would "back off yet again." C.F. testified that Defendant had made similar remarks during their earlier conversations on Facebook. C.F. testified that the conversation made her feel "[a]wkward."

At 5:51 p.m. that evening, Defendant texted C.F., "Buckle up." C.F. responded by telling Defendant to "[w]atch the speed," and he replied, "Yea[h] and hugs." C.F. explained that they were joking about Defendant having been pulled over for speeding when he drove her home from the bowling trip. Defendant then told C.F. that she was "scared" and could not "handle" him. Defendant said, "Its not that u couldnt handle its that u dont want too. Lol."[3] When C.F. responded, "Well lol," Defendant asked if she was "[a]fraid [she] might like it." When C.F. did not respond for over twenty minutes,

---

[2] It is the policy of this Court to protect the identities of minor victims.

[3] C.F. explained that "Lol" is an abbreviation for "laughing out loud."

Defendant texted, "Lol guess not." Defendant then suggested that C.F. could text him if she got bored. C.F. admitted that she deleted some text messages sent around this time because she had not yet shown them to her boyfriend and she was afraid that he would think she "was persisting in something."

At 7:01 p.m. on January 1, 2015, Defendant texted C.F. to ask if she thought "about us maken out any." When C.F. did not respond, Defendant persisted by asking, "Have u?" About twenty minutes later, C.F. responded, "Cant say I have. Why? Have you?" Defendant responded, "Yes dang u just don't like me any." C.F. assured him that she did like him, "[j]ust not the way you want me to i think." Defendant apologized and stated, "Just got to relize it the way it is." C.F. admitted that there were more text messages sent around this time that she deleted, but she could not remember what they were.

At 1:33 a.m. on January 3, 2015, Defendant sent a text to C.F. and then apologized for having texted the wrong person. When C.F. responded, "You're fine," Defendant replied, "I know i am lol." C.F. called Defendant "Smart butt," and Defendant called her "Cute butt." C.F. demurred, "If only," and Defendant assured her "U r [t]o me." Later that evening, Defendant texted C.F. that it was a "[c]uddlen kinda nite." C.F. responded that it was "gloomy."

The next morning around 8:30 a.m., Defendant contacted C.F. again and asked if she had "been out yet." C.F. responded that she was still in bed and asked if Defendant's son was awake yet because Defendant's son told her to call him when she woke up. She told Defendant that she was "bored," and he offered to "help" relieve her boredom. C.F. responded that it was "[t]oo gloomy for the park." Defendant insisted that he was not thinking about "that" and stated that C.F. could not "handle the other." Although C.F. understood that Defendant was referring to having sex, she responded, "The other? Lol." Defendant explained that he meant "meeting and letting me." C.F. again pretended not to understand by saying, "Letting you what?? Im blonde sorry lol." Defendant refused to say, telling C.F. that she would "have to wonder" and that she knew "what i want to[ ] do." C.F. asked Defendant if he meant that he wanted to hug and talk, and Defendant responded, "And makeout."

When C.F. did not respond, Defendant asked if she was shocked or mad. C.F. denied that she was mad. Defendant told her, "Well u did ask," and C.F. responded, "I did. True. Lol." Defendant said that he was "playen" and told C.F. that he "would if u would." When C.F. again did not respond, Defendant asked if he had scared her away by "just talken about it" and asked why she had stopped "playen." C.F. told Defendant that she had not responded because she kept "dozing off;" however, C.F. testified that she had really stopped responding because Defendant made her uncomfortable. Defendant told her, "U would like [it] if u tried." Defendant stated he would "go slow too[.] Intercores

- 3 -

slow lol." C.F. testified that she understood this to mean that Defendant would "go slow having sex" and that it made her feel uncomfortable.

Defendant promised that "nobody but u and i would know and hope the same of u." C.F. asked Defendant, "How do you think [your son] would feel[]? It would not be fair." Defendant assured her that his son "would never know[ u]nless u told." C.F. insisted that she "would never do that to him" and recalled that Defendant had previously said that he did not believe in cheating. Defendant said it would not be wrong because neither of them was married, but he was afraid that she would tell his son if they broke up. C.F. assured him that she did not tell secrets but that she was not planning on breaking up with his son either. Defendant replied, "so u should let me lol." C.F. stated, "I don't think so." Defendant responded, "Aww just once and if u didn't want to again []id understand." Defendant persisted that he would be okay if C.F. did not want to do it again even though he would want to. C.F. testified that when Defendant said "just once," she understood that he was referring to having sex.

When C.F. stopped responding, Defendant asked if she had gone back to sleep or had gone to church. C.F. said that she was about to get in the shower, and Defendant asked her, "can i join lol[?]" Defendant then described the following scenario: "I could hear yr mom. [C.F.] whats all the noise for in the shower? Mom it was me telling Gary no. Not here lol." Defendant said it was good that he had made C.F. smile. While testifying, C.F. cried as she read the following text from Defendant: "U would scream seeing me in the shower with u and me being hard lol." Defendant asked if C.F. would "touch it or just run." C.F. testified that these texts made her feel scared. C.F. told Defendant, "I don't think we should talk about this anymore." Defendant apologized for making her mad and stated, "Anytime u get bored and can handle playen." C.F. testified that she understood this to mean "[t]rying to talk about nasty stuff over text message."

That afternoon, at 3:10 p.m., Defendant texted C.F., "The park wouldnt be to gloomy after all. Its kinda nice out." C.F. agreed "now it is." Defendant asked C.F. what she was doing, and she told him that she was cooking meatloaf. Interspersed with their discussion about food, Defendant stated, "Glad i didnt make u to mad," and explained, "I got carried away with my thoughts[ ]and made u feel bad kinda." C.F. explained that she "[w]as just uncomfortable," and the conversation returned to food. Defendant then said, "The thought of seeing it was to much but than asken would u touch or run. Well made u run lol," before returning to the subject of food. C.F. mentioned that Defendant could reopen a restaurant he used to own and that they could be the cooks. Defendant responded that he would "make u mad to much." C.F. asked, "Make me mad too much?" Defendant explained that he meant "flirten and asken for to much[ i]n those ways." C.F. testified that she understood Defendant was talking about asking for sex. Defendant said he was "[j]ust being honest." Defendant asked, "couldnt u see us cleaning up at the end of the day[ ]and being closed and me trying to kiss u[?] And than

- 4 -

u getting mad at me!" C.F. agreed that she could. Defendant and C.F. discussed her and his other son's girlfriend singing at the restaurant on the weekends. Defendant then asked, "Could u handle keep telling me no tho[?]" C.F. testified that she understood Defendant was referring to her "telling him no to have sex." C.F. responded, "It will always be no. Could you handle keep getting rejected lol[?]" Defendant replied that he did not know but that he would "always respect ya that no ment no." Defendant elaborated, "Same as if we to ever sneak and meet if u said stop i would." C.F. finally told Defendant, "Maybe just be a good idea if we don't talk. This just seems kind of inappropriate. Im sure you could agree." Defendant responded that if she wanted him to "stop texten," he would. Two days later, Defendant apologized again and then stopped texting C.F.

C.F. testified that she told her best friend about the text messages and that her friend suggested she tell Defendant's son. C.F. testified that she did not initially tell an adult about the messages because she did not want to get Defendant in trouble. C.F. testified that the whole situation made her feel afraid and uncomfortable.

On cross-examination, C.F. testified that she did not recall ever talking to Defendant first but conceded that she might have and that she usually replied every time he contacted her. C.F. testified that initially she and Defendant sent direct messages to each other on Facebook. C.F. believed that Defendant contacted her first, asking for her phone number. C.F. characterized their conversations on Facebook as "small talk." C.F. denied asking Defendant questions about personal matters. C.F. conceded that there were other text messages in addition to the ones introduced at trial. She characterized them as "[a]bout the same," but the ones introduced at trial "were worse than the other ones." C.F. admitted that she deleted the other messages because she did not want her boyfriend to see them and "have a bad idea of his own father." C.F. denied initiating the conversations.

Detective Ricky Jeffers of the Campbell County Sheriff's Office testified that he became involved in this case when a referral was made to the Department of Children's Services about Defendant being physically abusive to his son. During the investigation, Detective Jeffers spoke to C.F. and discovered the text messages on her phone. After documenting the messages by taking pictures of C.F.'s phone, Detective Jeffers spoke to Defendant at his home. Defendant was "[a] little nervous and a little embarrassed acting but mostly very courteous." Detective Jeffers spoke to Defendant about his side of the story and prepared a written statement. Detective Jeffers explained that he wrote the statement but that Defendant had a chance to review it and make any changes or clarifications before signing it. The following statement was entered into evidence:

> [Defendant] states he understands he is not in custody and understands he
> does not have to speak with Det. Jeffers. [Defendant] states he began

speaking to his son['s] . . . girlfriend [C.F.] who he believed to be 16 years of age on the internet on or about the first of October 2014 and then progressed to texting each other. [Defendant] states he knows the conversations between he and [C.F.] were inappropriate and that he let them go too far. [Defendant] states he and [C.F.] did have sexual conversations via text and he knows that went to[o] far and wishes he had not let it go that far. [Defendant] states he never intended to actually meet [C.F.] for sex and would never have let that happen. [Defendant] states this situation has caused him issues with his son . . . . [Defendant] states he is sorry this ever happened [and] has asked forgiveness from God, [his son] and [C.F.] [Defendant] states during his and [C.F.'s] text messaging they did discuss meeting at the park for sex but [Defendant] says he would have never met [C.F.] because of her age. He was just in a vulnerable time in his life and let it go too far.

Detective Jeffers testified that Defendant did not say anything else about why he sent the text messages other than that it was a mistake.

On cross-examination, Detective Jeffers admitted that he did not record or videotape the conversation with Defendant. The conversation only lasted about fifteen or twenty minutes. Detective Jeffers conceded that the statement was written in his handwriting and that it did not reflect everything Defendant said verbatim. Detective Jeffers testified that Defendant also talked about other things, such as troubles at his job, while Detective Jeffers was preparing the statement. Detective Jeffers testified that when he is through writing a statement, he asks the subject to read over it carefully and gives the subject an opportunity to change, add, or clarify anything. Detective Jeffers denied that Defendant said anything important to the case that was not contained in the written statement.

The forty-eight-year-old Defendant testified on his own behalf. Defendant testified that he had six children and three grandchildren and that he did the best he could as a single father. Defendant first learned about C.F. in October 2014 when his fifteen-year-old son left his Facebook page open after going to bed. Defendant was "disturbed" when he read messages about his son having sex. Defendant spoke to his son about the messages, telling him that he was "too young to be having sex and take a chance on screwing up his life." Though his son did not agree with him, Defendant chose to "let it go" and hoped that his son "would see how things were."

Defendant testified that about two weeks later, he received a message on Facebook at 1:30 in the morning from his son's girlfriend, C.F. She said that she was bored and could not sleep. Defendant did not believe that a fourteen-year-old girl should be contacting a forty-eight-year-old man at 1:30 in the morning. Defendant testified that he

did not continue the conversation and that he spoke to his son a second time. Defendant was scared that his son would have sex and get this girl pregnant, potentially ruining his son's dreams of going to college. Defendant testified that C.F. messaged him again two weeks later and that he then blocked her on Facebook.

Defendant testified that C.F. then began sending him text messages. Defendant denied that he gave his phone number to C.F. and believed that she instead got it from his personal information on Facebook. Defendant insisted that there were more text messages than those entered into evidence, including C.F. talking about suicidal thoughts and her drug-addicted mother. Defendant testified that these messages as well as several posts on C.F.'s Facebook page "scared [him] to death that [his] son was fixing to screw his life up." Defendant denied that he ever intended to "meet up with this little girl," explaining that he instead wanted "to show [his] son what kind of girl he thought was marriage material." Defendant testified that his son was not listening to him and was becoming rebellious.

As to the text messages that were entered into evidence, Defendant admitted that he made a mistake, explaining that he "handled it as a best friend would rather than how a father would." Defendant denied that he had any "intentions of ever meeting the little girl for intimacy," but explained that he instead planned "to load [his] son up in [his] vehicle with [him] and say . . . [']you won't listen to me, but this little girl is gonna meet your dad.[']" Defendant admitted that he flirted with C.F., stating, "She wanted to talk like a woman, and I talked to her like a woman." Defendant denied that his actions amounted to rape, and he was upset that a newspaper article claiming that he had been indicted for rape had severely impacted his business.

Defendant testified that he was contacted by Detective Jeffers and scheduled to meet with him at Defendant's house. Defendant believed that Detective Jeffers was there to discuss the allegations that Defendant had physically abused his son. Defendant testified that when Detective Jeffers explained that he was there to discuss the text messages with C.F., Defendant gave him the same explanation that he gave in court. However, when he read the first two lines of Detective Jeffers's report, Defendant was concerned that it was "gonna make [him] look like a bad man." Defendant testified that Detective Jeffers assured him that the report was "just the topics that you talked about," and that once Detective Jeffers "fill[ed] in the blanks, [he] d[id]n't think there will ever be anything come of it." Defendant explained that he and Detective Jeffers "talked about so much that he couldn't write it all down, so he just put topics down of what he needed to talk about." Defendant testified that he agreed to sign the report because of Detective Jeffers's assurances, believing that Detective Jeffers would later "fill in between these paragraphs." Defendant testified that he told Detective Jeffers that he did not instigate the text messaging. Defendant testified that when he objected to the statement, Detective

Jeffers became aggressive. Defendant testified that he had nothing to hide and that he told Detective Jeffers the truth of what happened.

On cross-examination, Defendant admitted that he "handled the situation wrongly." Defendant admitted that he initialed both the beginning and the end of the statement prepared by Detective Jeffers, that there was an X underneath the statement to prevent anything from being added after it, and that he signed at the bottom of the statement. Defendant agreed that he attempted to lure C.F. to the park in an attempt to prove to his son that she would have cheated on him with his father. Defendant said, "I tried to show my son as a friend what kind of girl he was messing up with, where I should have took a stand as a father and said, [']you're not allowed to see her.[']"

Defendant admitted texting C.F. and flirting with her, but he claimed that she initiated the conversations. Defendant denied that he had any "intentions of doing anything with her" or that he had any "sexual thoughts of mine to her." Defendant claimed that he "put a stop to the conversation four different times over four months" and that there were other conversations in October and November that "went through different stages of flirting." Defendant claimed that C.F. was texting him from two different phones and that there were significant portions of the conversation missing from the texts that were entered into evidence. Defendant claimed that the "Cute butt" message was in reference to his girlfriend, not C.F.

Defendant repeatedly insisted that he was only attempting to lure C.F. to the park in order to show his son "what kind of girl she was." Defendant did not know what C.F. would believe his "words of flirt" to mean, but he insisted that "there wasn't anything meant by it." Defendant denied wanting to have sex with C.F. or telling her about sex. Defendant admitted talking about hugging and holding. Defendant testified that when he said he would go "[i]ntercores slow," he meant "hugging, affection, stuff like that," rather than meaning it in "a sexual way." Defendant explained, "The girl wanted to act like a woman, and I talked to her like a woman." Defendant admitted that when he mentioned "being hard" while in the shower with C.F. and asking her if she would "touch it," he was referring to his erect penis. Defendant testified that "[t]his [fourteen]-year old child that you're talking about handled some very explicit language." Defendant agreed that C.F. repeatedly turned him down and that he was the one who would return otherwise innocent conversation to the topic of sex. Defendant admitted that he did "talk sexual to her;" however, Defendant insisted that he never intended to have sex with C.F. and that he was only flirting. Defendant claimed that the text messages were taken out of context and that if he "had the opportunity of having all of them from the beginning to the end . . . and show it to [the jury], they would get a whole different story of it." Defendant testified that C.F. flirted with him and that she was acting like an adult. When C.F. finally terminated their conversations on January 4, 2014, by saying that it "seems kind of

inappropriate," Defendant testified that she was repeating words that he had used in October and November.

On redirect examination, Defendant again explained that despite his concerns after reading the first few lines of the statements prepared by Detective Jeffers, he signed it believing that Detective Jeffers was going to "fill in the blanks" and "tell the rest of the story." Defendant was concerned at the time he gave the statement that the publicity surrounding a local murder case would impact the public perception of his case. Defendant reiterated that he handled the situation wrong, acting like his son's best friend rather than as his father. Defendant stated, "My intentions was nothing, nothing to do with having intercourse with this little girl." Defendant stated that C.F. spoke to him like an adult and that he replied in kind. Defendant explained some of the breaks in the conversation were due to the fact that C.F. was texting him from two different phones. Defendant testified that he no longer had his phone because it was "sent . . . off to be tested." Defendant admitted, "I flirted, I said things," but insisted that he never intended to actually have any sexual contact with C.F.

*Analysis*

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Tennessee Code Annotated section 39-13-528(a) makes it an offense for anyone eighteen years of age or older to use "written or electronic communications . . . to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age . . . to engage in conduct that, if completed, would constitute a violation by the soliciting adult" of several enumerated sexual offenses, including statutory rape. *See* T.C.A. § 39-13-528(a)(7). Aggravated statutory rape is defined as "the unlawful sexual penetration of a victim by the defendant, or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least ten (10) years older than the victim." T.C.A. § 39-13-506(c). Sexual penetration includes sexual intercourse. T.C.A. § 39-13-501(7). It is no defense to the solicitation charge that "the solicitation was unsuccessful [or] that the conduct solicited was not engaged in." T.C.A. § 39-13-528(b).

Defendant argues that the State "failed to produce any evidence that the conduct that the defendant solicited would have, if completed, resulted in the sexual penetration of the victim by the defendant." However, when viewed in the light most favorable to the State, the evidence presented at trial clearly demonstrates that Defendant sent multiple text messages to C.F. over the course of a few days in an attempt to induce her to meet him for sexual intercourse. In addition to innuendo-filled references to "that" and "it," which C.F. testified she understood to be referring to sex, Defendant's explicit requests progressed from hugging and holding, to making out, to going "Intercores [sic] slow" and having C.F. touch his erect penis. In his statement to Detective Jeffers, Defendant admitted that he had "inappropriate . . . sexual conversations via text" during which he and C.F. "did discuss meeting at the park for sex." Defendant even admitted at trial that he was attempting to induce C.F. to meet him in the park in order to show his son that she was willing to cheat on him with his father. The fact that Defendant may not have intended to actually have sex with C.F. is irrelevant to whether he intentionally solicited her to engage in conduct that, if completed, would have constituted aggravated statutory rape. Defendant admitted that he intentionally sent the text messages, knowing that he was more than ten years older than the minor victim. The evidence in this case is more than sufficient to sustain Defendant's conviction for solicitation of a minor to engage in aggravated statutory rape.

*Conclusion*

Based on the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE

- 10 -